IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LAWRENCE F. HALPERT, D.D.S.,          *

     Plaintiff,          *

        v.          *          Civil Action No.: RDB 05-2776

DENTAL CARE ALLIANCE, LLC, *et al.*,          *

     Defendants.          *

*     *     *     *     *     *     *     *     *     *     *     *     *

## MEMORANDUM OPINION

This action arises out of a Complaint that Plaintiff Lawrence F. Halpert, D.D.S.

("Plaintiff" or "Halpert") filed against Defendants Dental Care Alliance, LLC, Steven R. Matzkin,

Mitchell Olan, and David Nichols (collectively, "Defendants").  Pending before this Court are

cross-Motions for Summary Judgment.  (Paper Nos. 34 & 37.)  The primary issue raised by these

papers is whether Defendant Dental Care Alliance, LLC's agreement to assume another

company's contractual obligation to pay Plaintiff $250,000 is enforceable.  Plaintiff argues that

the agreement is valid and that Plaintiff is its intended beneficiary.  Defendants maintain that the

agreement is void as a matter of law.  This Court has jurisdiction under 28 U.S.C. § 1332.  The

parties' submissions have been reviewed and no hearing is necessary.[1]  *See* Local Rule 105.6 (D.

Dd. 2004).  For reasons that follow, Plaintiff's Motion for Summary Judgment is DENIED and

Defendants' Motion for Summary Judgment is GRANTED with respect to Counts One, Two, and

Three, and DENIED with respect to Count Four.  As a result, this case will proceed to trial.

---

[1]     On April 12, 2007, counsel for the parties declined an opportunity for an immediate hearing and indicated that they were not available for a hearing on this matter until June 2007.

## BACKGROUND AND PROCEDURAL HISTORY

**I.      Corporate Structure and Underlying Transactions.**

      **A.      Halpert's Dental Practices.**

Plaintiff Lawrence F. Halpert, D.D.C. was the owner of two dental practices: Mid-Atlantic Dental Associates, P.A. ("MADA") and Ned Greenberg, D.D.S. & Associates, P.C. ("Greenberg").  Halpert was also the majority owner of DentalCo Management Services of Maryland, Inc. ("DentalCo"), a business that provided services to MADA and Greenberg.

      **B.      InterDent and GDSC Acquire Halpert's Dental Practices.**

In the summer of 2000, InterDent, Inc. ("InterDent") and its subsidiary Gentle Dental Services Corporation ("GDSC") purchased DentalCo from its secured creditor, Bank of America, which had foreclosed on DentalCo's assets.  Because DentalCo's business stemmed from its service agreements with MADA and Greenberg, InterDent and GDSC also decided to purchase those dental practices.

On August 28, 2000, Halpert, GDSC, InterDent, MADA, and Greenberg entered into two Shares Acquisition Agreements pursuant to which GDSC purchased MADA and Greenberg from Halpert for $750,000.  (*See* Pl.'s Mem. Supp. Summ. J. Exs. 1-2 (the "Halpert Agreements").) The Halpert Agreements provided that the $750,000 purchase price would be paid in three installments of $250,000: the first installment was due on August 28, 2000; the second installment was due on August 28, 2001; and the third installment was due August 28, 2002.  (*See id*. at § 2(a).)  Each installment payment was guaranteed by InterDent.  (*Id*. at § 10(l).)

**C.     GDSC Designates Ervin Raffel as Owner of the Dental Practices.**

The Halpert Agreements gave GDSC the right to name the shareholder or owner of

MADA and Greenberg.  This arrangement was necessary because, *inter alia*, Maryland law

requires that only a licensed dental professional may own a dental practice.  *See* Md. Code Ann.,

Health Occ. § 4-601(a) (West 2007) ("Except as otherwise provided in this title, a person may not

practice, attempt to practice, or offer to practice dentistry or dental hygiene on a human being in

this State unless licensed by the Board.") & § 4-101(j)(1) (defining "licensed dentist" as "a dentist

who is licensed by the Board to practice dentistry.").

The Halpert Agreements also provided that upon payment of the *second* installment, the

shareholder designated by GDSC would acquire the shares of the dental practices:

> Upon delivery of such notice and payment of the *second*
> installment, the [designated shareholder] shall be deemed to have
> acquired the Shares and shall be deemed to have become a
> shareholder of [the dental practice] without any further action on
> the part of the [designated shareholder], [Halpert] or [the dental
> practice].  However, at GDSC's request [Halpert] shall also deliver
> an assignment of the Shares to the [designated shareholder] in form
> and substance reasonably satisfactory to GDSC.  Upon
> consummation of the purchase and transfer of the Shares, GDSC,
> [designated shareholder] and [the dental practice] shall execute an
> agreement similar to this Agreement, by which the [designated
> shareholder] shall grant GDSC an option on terms customarily
> obtained by GDSC for similar options; provided, however, that the
> total purchase price to be paid to the [designated shareholder](as the
> new Stockholder) upon exercise of the option granted under such
> agreement shall be $50.

(Halpert Agreements § 2(a) (emphasis added).)

On December 31, 2000, GDSC designated Ervin Raffel, DDS ("Raffel"), as the

shareholder of MADA and Greenberg.  In December 2000, Raffel asked Halpert if he would

agree to transfer the shares or ownership interest in MADA and Greenberg immediately, instead

of waiting until the second installment payment on August 28, 2001.  Halpert agreed to accelerate

the transfer of the shares on the condition that the shares would be returned to him if GDSC failed

to pay the second installment within 30 days of August 28, 2001.  On January 2, 2001, Halpert,

InterDent, and GDSC amended the Halpert Agreements to reflect this agreement. (*See* Nichols

Aff. Exs. 3A & 3B (the "Halpert Amendments").)

Effective January 2, 2001, Raffel acquired all of the MADA stock and 99% of the

Greenberg stock and replaced Halpert as the Director and President of the Practices.  Raffel and

GDSC entered into two new Shares Acquisition Agreements.  (*See* Nichols Aff. Exs. 2A & 2B

(the "Raffel Agreements").)  The Raffel Agreements gave GDSC the right to designate future

shareholders of the MADA and Greenberg dental practices.  (*Id*. at § 2(a).)

**D.      DCA, Inc. becomes Responsible for Managing the Dental Practices.**

InterDent owned two subsidiaries for purposes of managing dental practices in the United

States: GDSC, which managed dental practices in the western half of the United States, and

Dental Care Alliance, Inc. ("DCA, Inc."), which managed dental practices in the eastern half of

the United States.  Because the dental practices purchased from Halpert were located in the

eastern half of this country, InterDent made DCA, Inc. responsible for the managing those

practices under the agreements acquired in connection with InterDent and GDSC's purchase of

DentalCo.[2]  (*See* Nichols Aff. ¶ 6.)

**E.      Mon Acquires the Dental Practices.**

In early 2001, three InterDent executives—Defendants Steven R. Matzkin ("Matzkin"),

---

[2]      The record does not reflect the date that DCA, Inc. became responsible for
managing MADA and Greenberg.

Mitchell Olan ("Olan"), and David Nichols ("Nichols")—formed Mon Acquisition Corp. ("Mon.")  Mon approached InterDent to discuss acquiring DCA, Inc. and certain assets of dental practices located in the eastern half of the United States.  Negotiations ensued and the parties eventually reached an agreement.

Effective June 1, 2001, Mon purchased DCA, Inc. and other assets from InterDent, GDSC, and DentalCo for a purchase prices of approximately $34 Million.  (*See* Nichols Aff. Ex. 4 (the "Mon Agreement").)  Under the Mon Agreement, the management agreements covering the MADA and Greenberg dental practices and the contracts between and among InterDent, GDSC, MADA, and Greenberg were transferred to Mon.  The Mon Agreement reflects that Mon purported to assume GDSC's "indebtedness" to Halpert, *i.e.*, the remaining $500,000 in installment payments that were due under the Halpert Agreements.[3]  (*See* Mon Agreement, § 1.01(d), Sch. 1.01(d), & Sch. 1.02)); *see also* Discussion § III.A, *infra* (discussing assumed indebtedness in further detail).[4]

---

[3]     As this Court explains below, Plaintiff initiated a lawsuit against DCA, LLC in the Circuit Court for Howard County.  The focus of that lawsuit was whether Plaintiff could compel DCA, LLC to participate in arbitration proceedings under the Halpert Agreements.  The Circuit Court for Howard County did *not* reach the merits of the causes of action asserted in this litigation.  *See generally* Background and Procedural History § II.C, *infra*.  The court did address, however, factual matters that are relevant to the background of this case.  In connection with the Mon acquisition, for example, the court noted that "Mon acquired no *rights* under the Halpert Agreement since the right to designate the shareholder of MADA and Greenberg had already occurred and the Halpert Agreement had already been superseded by the Mon Purchase Agreement."  *Halpert v. DCA, LLC*, Case No. 13-C-03-055620 at pp. 5-6 (Circuit Court for Howard County June 2, 2004) (unpublished) (emphasis added).

[4]     The parties dispute the timing and extent of Halpert's knowledge of transactions memorialized in the Mon Agreement.  (*Compare* Pl.'s Opp. & Reply p. 35 ("As the demand notice was being sent to InterDent, it must be remembered that at this time, Dr. Halpert was still in the dark as to the nature of the transaction that had occurred between InterDent and Dental Care Alliance.") *with* Def.'s Reply p. 9 n.6 ("[N]ews of the Mon Agreement was widely

**F.     The Second Installment Payment to Halpert.**

Under the Halpert Agreements, the second installment payment that GDSC owed Halpert was due on August 28, 2001.  As noted above, the second installment payment was critical to transferring ownership of the MADA and Greenberg dental practices from Plaintiff to GDSC because the Halpert Agreements and Amendments specifically provided that Halpert would relinquish all claims on the shares of the dental practices only upon receiving the second installment payment.  (*See* Halpert Agreements § 2(a); Halpert Amendments § 2.)

In August 2001, before the second installment payment became due, Defendant Olan contacted Halpert in an attempt to restructure the second installment payment.  Negotiations ensued and draft amendments to the Halpert Agreements were exchanged.  These negotiations, however, were ultimately unsuccessful.

On September 26, 2001, Halpert received the second installment payment of $250,000. That same day, Defendant Nichols sent a memorandum to Halpert's counsel providing that:

> $250,000 has been wired today to Dr. Halpert's account at Allfirst
> Bank per the instructions previously provided.  Such payment is in
> satisfaction of the installment schedule as provided pursuant to (i)
> Section 2(a) of the Shares Acquisition Agreement between
> Lawrence F. Halpert, DDS, Mid-Atlantic Dental Associates, P.A.,
> InterDent, Inc., and Gentle Dental Service Corporation, as well as
> (ii) Section 2(a) of the Shares Acquisition Agreement between
> Lawrence F. Halpert, DDS, Ned Greenberg, DDS & Associates,
> P.A., InterDent, Inc., and Gentle Dental Service Corporation, each
> dated August 28, 2000, as amended by two Amendments to Shares
> Acquisition Agreements dated January 2, 2001.

---

publicized to the dental and business community, and to the public at large. . . . Halpert cannot negate the reality of Defendants' widespread publication of the purchase simply by pleading that he had his head in the sand.").)

(Nichols Aff. Ex. 6.)  The memorandum was sent on letterhead from "Dental Care Alliance."[5]
(*Id.*)

### G.       Mon and DCA, Inc. Merge Into Defendant Dental Care Alliance, LLC.

Through the end of 2002, Mon operated the business assets acquired from InterDent, GDSC, and DentalCo.  At the end of 2002, however, Mon and DCA, Inc. were merged into Defendant Dental Care Alliance, LLC ("DCA, LLC").  (Nichols Aff. ¶ 1.)

### H.       The Third Installment Payment to Halpert.

On August 12, 2002, approximately two weeks before the third installment payment was due, Halpert's attorney sent a letter to InterDent and GDSC reminding them of the upcoming payment.  (*See* Halpert Dep. p. 148, ll. 15-18 ("Q. And you were looking towards InterDent for this payment?  Is that a yes?  A. Yes.  That's who it went to.  InterDent was who I made the contract with.").)

On August 28, 2002, Halpert did not receive his third and final installment payment of $250,000.  That same day, Halpert's attorney sent a letter to InterDent Executive Vice President Ted VanEerden demanding that InterDent guarantee GDSC's payment obligation under the Halpert Agreements:

> Following up our telephone conversations this week, and my letter to Stuart Chestler of August 12, 2002, you are aware that a $250,000 payment was due by Gentle Dental Service Corporation to Dr. Lawrence Halpert on August 28, 2002.  That payment was not made.
>
> We also understand that Gentle Dental sold or otherwise transferred

---

[5]       *Cf. Halpert v. DCA, LLC*, p. 6 ("Mon, acting through DCA and on behalf of GDSC, transferred $250,000 in August of 2001 in satisfaction of the second installment payment that GDSC owed to Dr. Halpert.").

its practice to Dental Care Alliance ("DCA") sometime in 2001, and that last year's $250,000 was made by DCA to Dr. Halpert. DCA has informed us that it will not be making this year's payment.

Notwithstanding the foregoing and notwithstanding DCA's unfounded allegations that it may have some claim or disagreement with Dr. Halpert, the Shares Acquisition Agreements entered into by Dr. Halpert with respect to the sale of his stock in Mid-Atlantic Dental Associates, P.A. and Ned Greenberg, D.D.S. & Associates, P.A. are between Gentle Dental Service Corporation and are guaranteed by InterDent, Inc.  There is no right of setoff in the Agreements, nor is there any reason or legal basis for which this payment is not now due and owing.  Plain and simply, InterDent now owes Dr. Halpert $250,000 without excuse.

(Halpert Dep. Ex. 22.)

The "unfounded allegations" referred to in the above letter relate to a significant factual dispute in this litigation.  This dispute concerns DCA, LLC's decision not to pay Plaintiff the third installment payment.  Defendants describe the matter as follows:

[I]n or around December, 2001, it came to the attention of [DCA, LLC] that in the days just prior to the consummation of the August, 2000 Halpert Agreements, Halpert had secretly entered into certain "sweetheart" contracts with a number of dental professionals of the Practices, which contracts had not been provided to the Practices or DCA, the management company . . . The existence of these previously unknown agreements raised certain issues under the Mon Agreement as to whether [DCA, LLC] was obligated to InterDent/GDSC to pay the last installment payment of $250,000 that GDSC and InterDent owed to Halpert.

(Defs' Mem. Supp. Summ. J. & Opp. p. 9.)  According to Plaintiff:

When the time for the third installments came due in August 2002, [DCA, LLC] refused payment and announced it would conduct an "investigation" into Dr. Halpert's alleged fraudulent concealment of employment contracts.  It conducted no investigation and, by its own admission, it discovered no fraud because none had been committed.  [DCA, LLC] nonetheless stubbornly refused the final payments.

(Pl.'s Mem. Supp. Summ. J. p. 23.)

## II.      Halpert Attempts to Collect the Third Installment Payment.

### A.      Halpert Arbitrates Dispute with InterDent.

Halpert attempted to arbitrate his dispute regarding the final installment payment owed by

GDSC and guaranteed by InterDent.  (Nichols Aff. ¶ 28 ("Dr. Halpert filed a complaint against

both InterDent/GDSC seeking to arbitrate the dispute.").)  Counsel for InterDent contacted

Halpert's attorney to request that Halpert consent to DCA, Inc. participating in the arbitration

proceeding as an interested party.  On December 16, 2002, Halpert's attorney responded as

follows:

> We will not agree to proceed voluntarily in arbitration with Dental
> Care Alliance as an "Interested Party."  As I indicated in one of our
> previous conversations, if including Gentle Dental Services
> Corporation complicates the issues that we wish to present, our
> demand for arbitration will be limited to InterDent, Inc.  It seems
> that this is the case, and therefore, on behalf of Dr. Halpert, I
> inquire whether or not InterDent, Inc. will proceed to arbitrate this
> matter without the inclusion of Dental Care Alliance.

(*Id*. at Ex. 7.)

### B.      InterDent Bankruptcy.

On May 9, 2003, during the course of the arbitration proceedings described above,

InterDent filed a petition under Chapter 11 of the United States Bankruptcy Code in the United

States Bankruptcy Court for the Central District of California, Santa Ana Division.[6]  As a result of

the bankruptcy, Halpert's arbitration proceedings against InterDent were stayed.  Halpert filed a

claim in the bankruptcy proceedings, alleging that InterDent breached the Halpert Agreements.

---

[6]      The record does not reflect the date that InterDent filed its bankruptcy petition in
the United States Bankruptcy Court for the Central District of California, Santa Ana Division.

On February 4, 2004, the Bankruptcy Court entered an Order on InterDent and Halpert's

Stipulation Resolving Claim, in which InterDent agreed that Halpert's claim would be allowed in

the amount of $250,000 as a general unsecured claim in the bankruptcy action.

On March 1, 2005, Halpert received $30,526.91 in connection with his claim against

InterDent and executed a stipulation providing that "in the event that Halpert shall successfully

collect any portion of the underlying obligation from DCA . . . the Debtors may seek indemnity

against Halpert to the extent Halpert obtains recovery on the Underlying Obligation against

DCA."  (Pl.'s Mem. Supp. Summ. J. p. 15.)

### C.    Halpert Sues DCA, LLC in Maryland State Court.

At some point, Halpert filed a Petition to Compel Arbitration against DCA, LLC in the

Circuit Court for Howard County, Maryland.[7]  The focus of that lawsuit was whether Halpert

could compel DCA, LLC to participate in arbitration proceedings under the Halpert Agreements.

The Circuit Court for Howard County did *not* reach the merits of the causes of action asserted in

this litigation.

O n June 4, 2004, Judge Diane O. Leasure granted summary judgment in favor of DCA,

LLC and against Halpert.  Judge Leasure held that DCA, LLC was *not* obligated to arbitrate

because it was not party to the Halpert Agreements:

> [W]hen Mon, DSA LLC's predecessor, entered into its Purchase
> Agreement with Interdent, GDSC, and DentalCo, the terms and
> conditions of the Halpert Agreement had already been satisfied,
> with the exception that the second and third installment payments
> to Dr. Halpert had not been made, and the entire Agreement had been
> superseded by way of the Raffel Agreement. . . . Thus, although the

---

[7]      The record does not reflect the date that Plaintiff initiated proceedings against
DCA, LLC in the Circuit Court for Howard County, Maryland.

> Petitioner may have other legal recourse by which he can seek to
> obtain the third and final installment payment that the Respondent
> has arguably obligated itself to pay, said Respondent cannot be
> required to participate in any arbitration proceeding related thereto
> as it was simply not a party to the Halpert Agreement and the
> arbitration provision contained therein.

*Halpert v. DCA, LLC*, Case No. 13-C-03-055620 at pp. 10-11.  There is no dispute that Plaintiff

decided not to appeal this decision.  (*See* Pl.'s Opp. & Reply p. 10.)

### D.     This Action.

On August 17, 2005, Plaintiff filed a Complaint against Defendants in the Circuit Court

for Howard County, Maryland.  On October 7, 2005, Defendants filed a Notice of Removal.  (*See*

Paper No. 1 ¶ 4 (asserting diversity of jurisdiction as the basis of this Court's jurisdiction).)  On

January 3, 2006, Plaintiff filed an Amended Complaint.  (Paper No. 21.)  On September 25, 2006,

Plaintiff filed his Motion for Summary Judgment.  (Paper No. 34.)  On October 20, 2006,

Defendants filed their Motion for Summary Judgment.  (Paper No. 37.)  On November 8, 2006,

Defendants filed an Amended Answer.  (Paper No. 42.)  On November 14, 2006, Defendants filed

a Second Amended Answer.  (Paper No. 46.)

### STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no *genuine* issue as to any *material* fact

and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)

(emphasis added).  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court

explained that only "facts that might affect the outcome of the suit under the governing law" are

material.  *Id.* at 248.  Moreover, a dispute over a material fact is *genuine* "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court further explained that, in considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment – even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215 (1985). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md. 1985). "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer,* 684 F.2d 62, 68 n.3 (D.C. Cir. 1982) ("[N]either party waives the right to a full trial on the merits by filing its own motion."). However, when cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non existence

of a factual dispute." *Shook v. United States,* 713 F.2d 662, 665 (11th Cir. 1983) (citation omitted).

## DISCUSSION

**I.     The Amended Complaint.**

The Amended Complaint contains four causes of action.  In Count One, Plaintiff asserts a claim for breach of a third party beneficiary contract against Defendant DCA, LLC.  (*See* Am. Compl. ¶¶ 24-28.)  In Count Two, Plaintiff asserts a breach of contract claim against DCA, LLC (*Id.* at ¶¶ 29-33.)  In Count Three, Plaintiff asserts a claim for tortious interference against DCA, LLC and Defendant Matzkin.  (*Id.* at ¶¶ 34-61.)  In Count Four, Plaintiff asserts a claim for fraudulent misrepresentation against DCA, LLC, as successor to Mon Acquisition Corp., and Defendants Olan and Nichols.  (*Id.* at ¶¶ 62-66.)  Plaintiff seeks approximately $2.5 Million in connection with these causes of action.[8]

**II.    Count One—Third Party Beneficiary Contract.**

**A.     The Agreement Among Mon, GDSC, and InterDent.**

Count One of the Amended Complaint arises out of Mon's acquisition of assets and

---

[8]     Although a joint status report provides that "[a] jury trial has been demanded as to all matters," (*see* Paper No. 30), the docket sheet and pleadings do not reflect that a jury demand has been filed in compliance with the Federal Rules of Civil Procedure.  (*See* Paper No. 1 (Notice of Removal with Civil Cover Sheet attached); Paper No. 2 (Complaint); Paper No. 9 (Answer); Paper No. 21 (Amended Complaint); Paper No. 23 (Answer to Amended Complaint); Paper No. 42 (Amended Answer); Paper No. 46 (Second Amended Answer).); *see also* Fed. R. Civ. P. 38(d) ("The failure of a party to serve and file a demand as required by this rule constitutes a waiver by the party of trial by jury."); *see also* 9 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure §2321 (2d ed. 1994) ("Waiver by failure to make a timely demand is complete even though it was inadvertent and unintended and regardless of the explanation or excuse."); Fed. R. Civ. P. 39(b) ("[N]otwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by a jury of any or all issues.")

contracts from GDSC and InterDent:

> The undisputed facts show that as part of the purchase price of its acquisition of assets and contracts from GDSC and InterDent, Mon expressly agreed to pay Dr. Halpert the second and third installments due under the [Halpert Agreements]. Accordingly, the amounts of the second and third installments were deducted from the purchase price paid by Mon to GDSC/InterDent, and Mon acquired and operated various assets, including the assets used in the MADA and Greenberg practices. Ultimately, Mon merged into Defendant [DCA, LLC]. Again, [DCA, LLC] has admitted that [it] is liable for the obligations of Mon.

(Pl.'s Mem. Supp. Summ. J. p. 17.)

The relevant portions of the Mon Agreement are as follows: In Section 1.01(d), Mon agreed to "assume . . . satisfy and discharge as the same shall become due . . . the obligations listed on Schedule 1.01(d) hereto. . . ."  (Mon Agreement, § 1.01(d).)   In Schedule 1.01(d), Mon agreed to "assume . . . the Funded Indebtedness listed on Schedule 1.02. . . ."  (*Id*. at Sch. 1.01(d).)  In Schedule 1.02, the "Funded Indebtedness" is defined as including obligations to "DentalCo" and "MADA."  (*Id*. at Sch. 1.02 (identifying $990,000.00 in connection with "Earnouts — DentalCo Indiana and MADA").)  The parties acknowledge that these obligations include the installment payments at issue.  (*See* Defs' Mem. Supp. Summ. J. & Opp. p. 6 (noting that the "funded indebtedness" under the Mon Agreement "includ[es] the remaining $500,000 (in two separate installments) that GDSC owed to Halpert. . . ."); Pl.'s Mem. Supp. Summ. J. p. 17 (same).)  Finally, Section 5.11 of the Mon Agreement provided that:

> <u>Assignments</u>.  Prior to Closing, (a) InterDent shall request assignments, if necessary, of all Funded Indebtedness, which assignments shall contain payoff amounts and (b) InterDent shall provide Purchaser with evidence of satisfaction in full or release of all guarantees, notes, or obligations of DCA and each Dental Practice related to an obligation of a Person other than DCA or such Dental Practice.

(Mon Agreement § 5.11; *see also id*. at Sch. 3.04 (where Mon "waives any requirement" of

GDSC or InterDent to obtain assignments).)  These provisions raise the question whether an

assignment of GDSC's payment obligation to Plaintiff was required for Mon to assume that

obligation.  To answer this question, this Court turns to the anti-assignment provision of the

Halpert Agreements.

###### B.      Anti-Assignment Provision in the Halpert Agreements.

The parties agree that the Halpert Agreements contain the following anti-assignment

provision:

> <u>Assignment; Successors and Assigns</u>.  Each party agrees that it will
> not assign, sell, transfer, delegate, or otherwise dispose of, whether
> voluntarily or involuntarily, or by operation of law, *any* right or
> *obligation under this Agreement* except in accordance with the
> terms hereof; provided, however, that GDSC may assign its rights
> and its obligations to Stockholder, under this Agreement to any
> corporation that it owns or controls, or that owns or controls it, or
> that is owned or controlled by any such corporation.  *Any purported
> assignment, transfer, or delegation in violation of this Section shall
> be null and void. . . .*

(Halpert Agreements ¶ 10(d) (emphasis added); *see also Halpert v. DCA, LLC*, ("The Halpert

Agreement also prohibited its assignment to any person or entity that was not either owned or

controlled by GDSC or that did not actually own or control GDSC.").)

However, the parties dispute the *effect* of the above anti-assignment provision on Mon's

purchase of assets from InterDent, GDSC, and DentalCo in 2001 and the resulting promise by

DCA, LLC to pay "the remaining installments due Halpert pursuant to the Halpert Agreements."

(Defs' Mem. Supp. Summ. J. and Opp. p. 15.)  Defendants contend that this promise was

"rendered null and void" by the anti-assignment provision set forth in the Halpert Agreements.

(*Id*.)  In contrast, Plaintiff maintains that, "as a party to the [Halpert] Agreements," he has

standing to "waive his right to enforce the provisions of those agreements if he so desires."  (Pl.'s

Reply and Opp. p. 23.)

As the source of this Court's jurisdiction over this case is based on diversity of

citizenship, the principles set forth in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) require

application of the law of Maryland to questions of substantive law.   Under Maryland choice of

law rules, "it is generally accepted that the parties to a contract may agree as to the law which will

govern their transaction, even as to issues going to the validity of the contract."   *National Glass,*

*Inc. v. J.C. Penney Properties, Inc.*, 650 A.2d 246, 248 (Md. 1994) (internal quotation marks and

citation omitted).   Here, the contracts at issue contain different choice of law provisions.   The

Halpert Agreement relating to MADA provides that it will be construed and interpreted in

accordance with Virginia law, (*see* Pl.'s Mem. Supp. Summ. J. Ex. 1, § 10(i)), while the Halpert

Agreement relating to Greenberg provides that Maryland law applies, (*id*. at Ex. 2, § 10(i)).

Accordingly, this Court applies Maryland and Virginia law.

In general, anti-assignment clauses are valid and enforceable in Maryland.  *See Handex of*

*Maryland, Inc. v. Waste Mgmt. Disposal Services*, 458 F. Supp. 2d 266, 271 (D. Md. 2006)

("[A]nti-assignment clauses have been held valid by Maryland courts.") (citing *Della Ratta v.*

*Larkin*, 856 A.2d 643, 652-653 (Md. 2004); *Pub. Serv. Comm'n v. Panda-Brandywine, L.P.*, 825

A.2d 462, 472 (Md. 2003); and *Clay v. Gov't Employees Ins. Co.*, 739 A.2d 5 (Md. 1999)).

Although there are few relevant decisions, anti-assignment clauses are also valid and enforceable

in Virginia.  *See Taylor v. King Cole Theatres*, 31 S.E.2d 260, 261 (Va. 1944) ("In the absence of

an express prohibition, all leases are assignable.") (citing *Wainwright v. Bankers' Loan & Inv.*

*Co.*, 72 S.E. 129 (Va. 1911)).

Courts commonly distinguish anti-assignment clauses that limit the parties' *right* to assign a contract from provisions that deprive the parties of *power* to assign the contract.  In *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, for example, the United States Court of Appeals for the Third Circuit recognized:

> [T]he general rule that contractual provisions limiting or prohibiting assignments operate only to limit a parties' *right* to assign the contract, but not their *power* to do so, unless the parties' manifest an intent to the contrary with specificity.  To meet this standard the assignment provision must generally state that nonconforming assignments (i) shall be "void" or "invalid," or (ii) that the assignee shall acquire no rights or the nonassigning party shall not recognize any such assignment.  In the absence of such language, the provision limiting or prohibiting assignments will be interpreted merely as a covenant not to assign, or to follow specific procedures—typically obtaining the non-assigning party's prior written consent—before assigning.  Breach of such a covenant may render the assigning party liable in damages to the non-assigning party.  The assignment, however, remains valid and enforceable against both the assignor and the assignee.

181 F.3d 435, 442 (3d Cir. 1999) (citations omitted; emphasis added); *see also Rumbin v. Utica Mut. Ins. Co.*, 757 A.2d 526, 531-33 (Conn. 2000) (collecting cases); Restatement (Second) of Contracts § 22 (1981) (discussing contractual prohibitions on assignment).  Maryland and Virginia courts do not appear to have directly addressed the distinction between contractual prohibitions on the right and power to assign a contract.

In this case, the anti-assignment provision at issue operates to limit the parties' *power* to assign GDSC's payment obligation under the Halpert Agreements.  There is no reasonable dispute that the anti-assignment provision of the Halpert Agreements covers GDSC's payment obligation to Plaintiff.  (*See* Halpert Agreements § 10(d) ("Each party agrees that it will not assign, sell, transfer, delegate, or otherwise dispose of, whether voluntarily or involuntarily, or by

operation of law, *any* right or *obligation under this Agreement* except in accordance with the

terms hereof. . . .") (emphasis added).  The anti-assignment provision of the Halpert Agreements

clearly provides that nonconforming assignments "shall be null and void."  (*Id.*)  This contractual

language manifests an intent to limit the parties' *power* to assign the Halpert Agreements.  There

is no basis, moreover, for treating this provision as merely limiting the parties' *right* to assign the

contract.  As a result, this Court rejects Plaintiff's argument that he may "waive his right to

enforce" the anti-assignment clause contained in the Halpert Agreements, (Pl.'s Reply and Opp.

p. 23),[9] and finds that any attempt to assign payment obligations under those agreements to Mon

without first obtaining written consent from Plaintiff would be null and void as a matter of law.[10]

---

[9]       Plaintiff's "waiver" argument fails for additional reasons.  The Halpert
Agreements provide that any waivers must be in writing.  (*See* Halpert Agreements § 10(c)
("The provisions of this Agreement may be waived, altered, or amended, in whole or in part,
*only with written consent* of all parties hereto.") (emphasis added).)  Neither side has suggested,
however, that written waivers exist in this case.  As a result, this Court finds that Plaintiff has
failed to provide sufficient evidence to meet the standard for waiver under Maryland or Virginia
law.  *See Questar Homes of Avalon, LLC v. Pillar Const., Inc.*, 882 A.2d 288, 294 (Md. 2005)
(waiver of a contractual right will not "be inferred from equivocal acts or language."); *May v.
Martin*, 137 S.E.2d 896, 865 (Va. 1964) ("A waiver of legal rights will not be implied except
upon clear and unmistakable proof of an intention to waive such rights") (internal quotation
marks and citation omitted).

[10]      This Court also rejects Plaintiff's argument that Defendants lack standing to
assert arguments based on the anti-assignment provision of the Halpert Agreements.  *See
generally* Restatement (Second) of Contracts § 309 cmt. c (1981) ("The conduct of the
beneficiary, however, like that of any obligee, may give rise to claims and defenses which may
be asserted against him by the obligor, and his right may be affected by the terms of an
agreement made by him.").  For similar reasons, this Court finds that the unclean hands doctrine
does not prevent Defendants from arguing that any purported transfer of GDSC's payment
obligations under the Halpert Agreements is null and void as a matter of law.  *Id.*; *see also*
Discussion §§ IV-V, *infra* (addressing Plaintiff's claims of tortious interference and fraudulent
misrepresentation).

**C.      Third-Party Beneficiary Contract.**

This Court's interpretation of the anti-assignment provision of the Halpert Agreements

requires that Count One of the Amended Complaint be resolved in Defendants' favor.  As noted

above, Count One asserts a claim for breach of a third party beneficiary contract against DCA,

LLC.  The underlying contract is described in the Amended Complaint as follows:

> [DCA, LLC] assumed the liabilities of [DCA, Inc.], including its
> obligations to pay Dr. Halpert the third installments due under the
> [Halpert Agreements], as a result of the merger of [DCA, Inc.] into
> Mon effective December 31, 2002, and the merger of Mon into
> [DCA, LLC] effective January 1, 2003.  Defendant [DCA, LLC]
> thus became the successor and surviving corporation to such
> entities for purposes of all the Counts alleged herein.

(Am. Compl. ¶ 26.)  Plaintiff's specific argument is that he is the "intended beneficiary of Mon's

express written promise to pay the last two installments due to him."  (Pl.'s Mem. Supp. Summ. J.

p. 17.)  DCA, LLC is in this lawsuit because, as noted above, it is "the successor and surviving

corporation" to Mon.  (Am. Compl. ¶ 26.)  Accordingly, this Court looks to the Mon Agreement

for purposes of considering Plaintiff's third-party beneficiary claim.

As noted above, the principles set forth in *Erie R.R. Co.*, 304 U.S. at 78, require

application of the law of Maryland to questions of substantive law.  Maryland choice of law rules,

moreover, provide that "the parties to a contract may agree as to the law which will govern their

transaction, even as to issues going to the validity of the contract."  *National Glass*, 650 A.2d at

248.  Here, the Mon Agreement provides that "[t]he provisions of this agreement and the

documents delivered pursuant hereto shall be governed by and construed in accordance with the

laws of the State of Delaware (excluding any conflict of law rule or principle that would refer to

the laws of another jurisdiction)."  (Mon Agreement § 9.07.)  Accordingly, this Court applies

Delaware law to Plaintiff's claim that he was an intended beneficiary of the Mon Agreement.

Under Delaware law, the general rule is that a stranger to a contract has no rights under that contract. *Insituform of North America, Inc. v. Chandler*, 534 A.2d 257, 268 (Del. Ch. 1987). However, a non-party may enforce a contract if it can prove that:

> [I]t is the intention of the promisee to secure performance of the promised act for the benefit of another, either as a gift or in satisfaction or partial satisfaction of an obligation to that person, and the promisee makes a valid contract to do so, then such third person has an enforceable right under that contract to require the promisor to perform or respond in damages.  If, however, it was not the promisee's intention to confer direct benefits upon a third person, but rather such third party happens to benefit from the performance of the promise either coincidentally or indirectly, then such third party beneficiary will be held to have no enforceable rights under the contract.

*Id*. at 268-69 (citations omitted); *see also Delmar News, Inc. v. Jacobs Oil Co.*, 584 A.2d 531, 534 (Del. Super. 1990) ("It is settled in Delaware that a third-party may recover on a contract made for his benefit. But in order for there to be a third party beneficiary, the contracting *parties* must intend to confer a benefit.") (internal citations omitted; emphasis added).[11]

_____

[11]     This Court notes that the parties applied Maryland law when analyzing Plaintiff's third party beneficiary claims.  (*See* Pl.'s Mem. Supp. Summ. J. pp. 17-19; Defs' Mem. Supp. Summ. J. & Opp. pp. 18-25.)  For purposes of resolving Count One of the Amended Complaint, the standard for establishing a third party beneficiary contract is substantially the same in Maryland and Delaware.  *See, e.g., Hamilton & Spiegel, Inc. v. Board of Ed. of Montgomery*, 195 A.2d 710, 711-12 (Md. 1963) ("It is not enough that the contract may operate to the benefit of the one claiming to be a beneficiary.  It must be shown that the contract was intended for his benefit; and, in order for a third party beneficiary to recover for a breach of contract it must clearly appear that the parties intended to recognize him as the primary party in interest and as privy to the promise.") (citations and internal quotation marks omitted).  This Court would reach the same resolution with result to Count One of the Amended Complaint under Maryland law. *See also General Ins. Co. of America v. Interstate Service Co., Inc.*, 701 A.2d 1213, 1219 (Md. Ct. Spec. App. 1997) (discussing conflict of laws issues that sometimes arise in the context of third party beneficiary claims).

In this case, the undisputed evidence establishes that there is no valid underlying agreement upon which Plaintiff can assert a third party beneficiary claim.  As explained above, Plaintiff's written consent was required in order for the parties to the Mon Agreement to effectuate their intent to transfer GDSC's payment obligations to Plaintiff to Mon.  No such written consent, however, was obtained.  As a result, GDSC's payment obligations to Plaintiff were not transferred to Mon.  (*See* Halpert Agreements § 10(d) (providing that any nonconforming assignments "shall be null and void."); *see also* Mon Agreement § 5.11 (requiring InterDent to "request assignments, if necessary, of all Funded Indebtedness.").)  This extends to each of the purported assignments at issue, including the initial assignment from GDSC to DCA, Inc., the subsequent assignment from DCA, Inc. to Mon, and the final assignment from Mon to DCA, LLC.

In sum, there is simply no valid underlying agreement with respect to GDSC's payment obligations upon which Plaintiff can assert a third party beneficiary claim.  *See generally* Restatement (Second) of Contracts § 309(1) (1981) ("A promise creates no duty to a beneficiary unless a contract is formed between the promisor and the promisee; and if a contract is voidable or unenforceable at the time of its formation the right of any beneficiary is subject to the infirmity."); *see also Sears, Roebuck & Co. v. Jardel Co.*, 421 F.2d 1048, 1055 n. 21 (3d Cir. 1970) ("[S]ince the beneficiary's rights depend on the contract, if for some reason the contract is invalid, 'no rights can arise in favor of anyone.'") (citing Restatement (First) of Contracts § 140 (1932) (applying Pennsylvania law).  Accordingly, Defendants' Motion for Summary Judgment is GRANTED with respect to Count I of the Amended Complaint.

**III.    Count Two—Breach of Contract**.

In Count Two of the Amended Complaint, Plaintiff alleges the existence and breach of a

contract between DCA, Inc. and Plaintiff:

> In August 2001, [DCA, Inc.], through its authorized and appointed
> officers, made a direct promise to Dr. Halpert to pay him the
> remaining amounts due under the [Halpert Agreements], including
> the second and third installments in the total amount of Two
> Hundred and Fifty Thousand Dollars ($250,000.00) each.  Dr.
> Halpert justifiably relied upon that promise in that he forbore from
> declaring default under the [Halpert Agreements] when he did not
> receive payment of the second installment when due on August 28,
> 2001.
>
> In accordance with the direct promise made to Dr. Halpert as set
> forth above, [DCA, Inc.] did eventually pay the second installments
> to Dr. Halpert, but it failed and refused to pay the third installments
> to Dr. Halpert when due on August 28, 2002 despite timely demand
> therefor.

(Am. Compl. ¶¶ 30-31.)  Plaintiff also alleges that DCA, Inc.'s promise to pay Plaintiff was

assumed by DCA, LLC.  (*Id.* at ¶ 32 ("[DCA, LLC] assumed the liabilities of [DCA, Inc.] . . . as a

result of the merger of [DCA, Inc.] into Mon effective December 31, 2002, and the merger of

Mon into [DCA, LLC] effective January 1, 2003.").)

The standard for establishing the existence of a contract is well-established:

> A contract is formed when an unrevoked offer made by one person
> is accepted by another.  Thus, mutual assent is an integral
> component of every contract.  An essential element with respect to
> the formation of a contract is a manifestation of agreement or
> mutual assent by the parties to the terms thereof; in other words, to
> establish a contract the minds of the parties must be in agreement as
> to its terms.

*Maslow v. Vanguri*, 896 A.2d 408, 421-22 (Md. Ct. Spec. App. 2006) (internal quotation marks

and citations omitted), *cert. denied*, 903 A.2d 416 (Md. 2006).  This Court has previously

recognized the "long line of Maryland cases" holding that "the hallmarks of a binding contract are an offer by one party and an unconditional acceptance of that precise offer by the other." *McKenzie v. Comcast Cable Comm's, Inc.*, 393 F. Supp. 2d 362, 369 (D. Md. 2005) (internal quotation marks omitted) (citing *Estrin v. Natural Answers, Inc.*, 103 Fed.Appx. 702, 704 (4th Cir. 2004) (unpublished) and *Lemlich v. Bd. of Trs.*, 385 A.2d 1185, 1189 (Md. 1978)); *see also Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001) (A plaintiff may recover in an action for breach of contract if it proves "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation.") (citation omitted).

After reviewing the parties' submissions, this Court finds that the oral contract alleged in Count Two of the Amended Complaint is barred by the Maryland statute of frauds. The Maryland statute of frauds provides:

> Unless a contract or agreement upon which an action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or another person lawfully authorized by that party, an action may not be brought: . . . On any agreement that is not to be performed within 1 year from the making of the agreement.

Md.Code Ann., Cts. & Jud. Proc § 5-901 (West 2007). The statute of frauds does not apply when a contract can be completed within the span of a year by any possibility, even if the parties intended for the contract to extend for a longer period of time. *See*, *e.g.*, *Griffith v. One Inv. Plaza Assocs.*, 488 A.2d 182, 184 (Md. Ct. Spec. App. 1985) (citation omitted)). In this case, there is no reasonable dispute that the terms of the alleged oral contract between Plaintiff and DCA, Inc. created an obligation that could not be satisfied within one year. The alleged contract was entered

into *before* late August 2001.[12]  The obligation with respect to the third installment payment,

however, was not due *until* August 28, 2002.[13]  As a result, the alleged contract between the

parties includes an "'express[] and specific[]' agree[ment] that their oral contracts were not to be

performed . . . within a year."  *Sun Cab Co. v. Carmody*, 263 A.2d 1, 3 (Md. 1970) (citation

omitted).  Maryland courts have held that this constitutes a "set[] of circumstances under which

the one-year provision of the Statute of Frauds will bar a claim."  *Griffith*, 488 A.2d at 184.

Accordingly, Defendants' Motion for Summary Judgment is GRANTED with respect to Count

Two of the Amended Complaint.[14]

## IV.    Count Three—Tortious Interference.

In Count Three, Plaintiff asserts a cause of action for tortious interference against DCA,

LLC and Defendant Matzkin.  (*See* Am. Compl. ¶¶ 34-61.)  The basis of this claim is that

Defendants "entered into the [Mon Agreement] under which Mon, as a predecessor to [DCA,

---

[12]    (*See*, *e.g.*, Halpert Dep. p. 140 (testifying that the conversation with Matzkin occurred "before" the "[e]nd of August."); Am. Compl. ¶ 30 ("In August 2001, [DCA, Inc.], through its authorized and appointed officers, made a direct promise to Dr. Halpert to pay him the remaining amounts due under the [Halpert Agreements]. . .").)

[13]    (*See*, *e.g.*, Am. Compl. ¶ 31 (Providing that the third installment was "due on August 28, 2002."); Halpert Agreements § 2(a) ("The two subsequent installments shall be due on August 28, 2001 and August 28, 2002."); Halpert Amendments § 1 ("GDSC shall be responsible to pay the final two installments as they become due.").)

[14]    Putting aside the Maryland statute of frauds, Plaintiff fails to forecast sufficient evidence to establish the existence of an oral agreement between DCA, Inc. and Plaintiff.  The isolated "commitment" made by Defendant Matzkin does not purport to constitute an "offer" of any kind.  In addition, Plaintiff does not point to any evidence to support the claim that he "accepted" this offer.  *See Maslow*, 896 A.2d at 421-22 ("An essential element with respect to the formation of a contract is a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.").  This constitutes independent grounds for granting Defendants' Motion for Summary Judgement with respect to Count Two.

Inc.] assumed the obligation to pay Dr. Halpert" despite "acknowledg[ing] that they were aware"

of the anti-assignment provision of the Halpert Agreements.[15]  (Pl.'s Opp. & Reply p. 37.)

Under Maryland law, the tort of wrongful interference with contractual relations has five

elements: (1) existence of a contract between plaintiff and a third party; (2) defendant's

knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach

of that contract by the third party; and (5) resulting damages to the plaintiff.  *See Macklin v.*

*Robert Logan Assoc.*, 639 A.2d 112, 117 (Md. 1994); *K & K Mgmt. v. Lee*, 557 A.2d 965, 973-74

(Md. 1989); *Vane v. Nocella*, 494 A.2d 181, 192 n. 6 (Md. 1985); *Fowler v. Printers II, Inc.*, 598

A.2d 794, 802 (Md. Ct. Spec. App. 1991).

After reviewing the parties' submissions, this Court finds that Plaintiff's claim for tortious

interference fails as a matter of law.  First, Plaintiff cannot establish that Defendants *breached* the

Halpert Agreements.  This Court has already found that the anti-assignment provisions set forth in

the Halpert Agreements deprived GDSC or InterDent of the power to transfer GDSC's

indebtedness to Mon.  *See* Discussion § III.B, *infra*; (*see also* Halpert Agreement § 10(d).)  As a

---

[15]     There is no dispute that Count Three does *not* assert a claim for interference based
upon Mon's assumption of the Halpert Agreement.  In their opposition papers, Defendants
invoke principles of collateral estoppel to argue that such an approach is barred by the decision
issued by the Circuit Court for Howard County.  (*See* Defs' Mem. Supp. Summ. J. & Opp. p. 35
(Emphasizing the Circuit Court's holding "that the Halpert Agreements were *not* the contracts
relating to the Practices that were transferred to DCA under the Mon Agreement.").)  Under
Maryland law, in order to invoke collateral estoppel, a party must establish four elements: (1) the
issue decided in the prior adjudication was identical to the one presented in the action in
question; (2) there was a final judgment on the merits; (3) the party against whom collateral
estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) the
party against whom collateral estoppel is asserted was given a fair opportunity to be heard on the
issue.  *See In re Malinowski*, 249 B.R. 672, 675 (Bkrtcy. D. Md. 2000) (citations omitted).
Plaintiff concedes this point in his opposition papers.  (*See* Pl.'s Opp. & Reply p. 37
("Defendants correctly point out that the Circuit Court for Howard County ruled that the [Halpert
Agreements] were not 'Transferred Contracts' as defined in the Mon Acquisition Agreement.").)

result, any attempt to assign payment obligations under the Halpert Agreements to Mon without

first obtaining written consent from Halpert was null and void as a matter of law.  Second,

Plaintiff cannot show that *Defendants* breached the Halpert Agreements by entering into the Mon

Agreement.  As already noted, the Mon Agreement specifically required that "InterDent shall

request assignments, if necessary, of all Funded Indebtedness."  (Mon Agreement § 5.11; *see also*

*id*. at Sch. 3.04.)  These provisions do not evince an intent to breach the anti-assignment provision

of the Halpert Agreements.  Third, Plaintiff fails to forecast sufficient evidence to show that

DCA, LLC or Defendant Matzkin *intentionally* interfered with the Halpert Agreements.  (*Id*.; *see*

*also* Pl.'s Opp. & Reply p. 40 (describing Defendants' approach to anti-assignment clauses as an

"attitude of indifference").)  Accordingly, Defendants' Motion for Summary Judgment is

GRANTED with respect to Count Three of the Amended Complaint.

**V.      Count Four—Fraudulent Misrepresentation**.

     In Count Four, Plaintiff asserts a claim for fraudulent misrepresentation against DCA,

LLC, as successor to Mon Acquisition Corp., and Defendants Olan and Nichols.  (*Id*. at ¶¶ 62-

66.)  The basis of this claim is that the "partial and fragmentary disclosure" made to Plaintiff "in

late August 2001" regarding the transaction memorialized by the Mon Agreement "resulted in

denying [Plaintiff] the opportunity to declare InterDent to be in default of the terms of the

[Halpert Agreements] . . . more than one year before it sought protection under the bankruptcy

laws."  (Pl.'s Opp. & Reply pp. 44-45.)

     Under Maryland law, the tort of fraudulent misrepresentation has five elements: (1) a false

representation; (2) made with the knowledge of its falsity, or in reckless indifference to the truth;

(3) with the intent of defrauding the person claiming to be injured; (4) justifiable reliance by that

person; and (5) damages caused as a result of the fraudulent statement.  *See Miller v. Fairchild Indus.*, 629 A.2d 1293, 1301-1302 (Md. Ct. Spec. App. 1993), *cert. denied*, 634 A.2d 46 (Md. 1993); *see also Lubore v. RPM Assoc., Inc.*, 674 A.2d 547, 556 (Md. Ct. Spec. App. 1997) (noting that "mere silence is not actionable" unless "what is stated amounts to a partial and fragmentary disclosure") (internal quotation marks and citations omitted), *cert. denied*, 683 A.2d 177 (Md. 1996).[16]

Material factual disputes prevent this Court from resolving Plaintiff's claim for fraudulent misrepresentation as a matter of law.  First, the parties dispute the degree to which Defendants Olan and Nichols informed Halpert of the Mon Agreement and the degree to which Halpert knew about that transactions memorialized in that agreement.  Defendants claim that the transaction was "widely publicized," which "completely undermines" Plaintiff's claim that Olan and Nichols concealed information.  (Defs' Reply p. 21.)  However, Plaintiff points out that Nichols represented that he was "obtaining an assignment" of the Halpert Agreements from GDSC instead of acknowledging that Mon had already assumed GDSC's obligation under the Mon Agreement. (Pl.'s Opp. & Reply p. 44.)  This factual dispute must be resolved at trial.

The parties also dispute whether Plaintiff justifiably relied on the partial and fragmentary disclosure and suffered related damages.  Plaintiff claims that he was denied the opportunity to "declare InterDent to be in default of the terms of the [Halpert Agreements] . . . more than one year before it sought protection under the bankruptcy laws."  (Pl.'s Opp. & Reply pp. 44-45.) However, Defendants argue that "[t]he fact that InterDent happened to declare bankruptcy after

---

[16]      In their reply papers, Defendants do not dispute Plaintiff's claim that they were under a duty to disclose pursuant to the *Lubore* decision.  (*See* Defs' Reply p. 20-21.)

Halpert initiated his action against it but before he recovered full judgment simply cannot be viewed as having been proximately caused by any alleged failure by Olan and Nichols to disclose facts related to the Mon Agreement." (Defs' Reply p. 21.) This dispute must be considered in light of the August 2001 discussions that preceded the second installment payment under the Halpert Agreements. As noted above, receipt of the second installment payment was the trigger for transferring Halpert's ownership rights in the underlying dental practices to GDSC (and therefore Mon). To the extent that Plaintiff made decisions in this timeframe without knowing about the transactions and relationships created by the Mon Agreement, a reasonable factfinder could determine that Plaintiff detrimentally relied upon Defendants Olan and Nichols' alleged failure to disclose certain information and partial disclosure of other information. A reasonable factfinder could also credit Plaintiff's allegation that he refrained from "declar[ing] InterDent to be in default of the terms of the [Halpert Agreements] in August of 2001, more than one (1) year before it sought protection under the bankruptcy laws."[17] (Pl.'s Opp. & Reply p. 45.) Accordingly, Defendants' Motion for Summary Judgment is DENIED with respect to Count Four of the Amended Complaint.

**VI.     Motion to Strike**.

Defendants move to strike Paragraphs 3, 4, 7, 9, 10, 11, and 13 of the Affidavit of Terry B. Blair, Esq., that was attached to Plaintiff's opposition papers. (*See* Defs' Reply pp. 2-4.) The basis for striking these materials is that they are "patently inadmissible, unconfirmed by sworn or certified copies of papers referenced therein, and unsupported by personal knowledge." (*Id*. at p.

---

[17]     (*See also* Halpert Agreements § 9(a) (providing that any disputes "with respect to the interpretation or enforcement of this Agreement" would be submitted to "binding arbitration" if the parties were "unable to resolve the dispute.").)

3.)  The Court, however, has resolved the parties' Cross-Motions for Summary Judgment without considering the portions of the Blair Affidavit that Plaintiff seeks to strike.  *See* Discussion §§ I-V, *supra*; (*see also* Defs' Reply p. 3 ("Critically, almost all of the averments set forth in Blair's Affidavit are immaterial to the factual issues before the Court on the cross-motions for summary judgment).  Accordingly, Defendants' Motion to Strike is DENIED as moot.

## **CONCLUSION**

For reasons stated above, Plaintiff's Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED with respect to Counts One, Two, and Three, and DENIED with respect to Count Four.  A separate Order follows.


Dated: May 1, 2007                          /s/_____
                                            Richard D. Bennett
                                            United States District Judge